IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

**MATILDA RANDLE**, as personal
representative of Willie J. Jordan, Deceased,
and on behalf of the wrongful death
beneficiaries of Willie J. Jordan, Deceased                                    **PLAINTIFF**

VS.                                                          **CIVIL ACTION NO. 5:06cv163-KS-JMR**

**NATIONAL HERITAGE REALTY, INC.**,
d/b/a Yazoo City Health and Rehabilitation
Center                                                                          **DEFENDANT**

## ORDER

This cause is before the Court on Defendant's Motion to Exclude the Testimony and Opinions of the Plaintiffs' expert Dr. William Truly [Doc. # 166]. The Court conducted two days of hearings on this motion, the first in Hattiesburg on April 18, 2008, and the second in Jackson on April 25, 2008. The Defendant called two experts, Dr. Marc E. Mitchell and Ms. Christine Trahan. The Plaintiff called Dr. William Truly. Following the testimony, both sides were granted the right to submit written briefs on the issues presented in Defendants' *Daubert* motion. The Court has carefully reviewed the written pleadings and considered the briefs, the authorities and testimony, and hereby finds as follows:

**FACTUAL BACKGROUND**

This is a nursing home negligence case in which it is alleged that Yazoo City Health and Rehabilitation Center ("YCHRC") deviated from the standard of care owed to its resident, Mr. Willie J. Jordan, Plaintiffs' decedent.

1

Willie J. Jordan entered YCHRC for the final time on March 28, 2002. His admitting diagnosis included multi-infarct dementia, hypertension, psychosis, and prior alcohol abuse. Upon his admission his physical indicated his feet were warm and dry and there were no sores noted at that time. He was classified as full code status, which entitled him to receive all medical treatment necessary to sustain and maintain life. The nursing staff described Mr. Jordan as "unsteady gait, vision and hearing impaired, pleasant, cooperative and ambulatory behind a wheel chair for support, with chief complaint of declining functional abilities."

On June 18, 1996, Mr. Jordan was diagnosed with claudication of the left lower extremity, diminished pulses of the left lower extremity, and hypertension. On June 21, 1996, an abdominal aortogram with femoral run off arteriogram was performed in response to his diagnosis of peripheral vascular disease. The test revealed an occlusion of the left iliac arterial system, bilateral superficial femoral artery occlusions, and a left pelvis bone lesion. On June 26, 1996, Mr. Jordan underwent a femorofemoral bypass due to peripheral vascular disease with left common iliac occlusion and limb threatening ischemia of the left lower extremity.

On August 4, 2003, Mr. Jordan complained of soreness to his left heel and was assessed by his physician, Dr. Thompson. Dr. Thompson diagnosed him with a left heel wound, secondary to peripheral artery disease (PAD). Mr. Jordan's condition worsened, and an abdominal aortogram and bilateral lower extremity run off were performed at the University Medical Center on September 16, 2003. The tests revealed complete occlusion of the left iliac system beginning at the origin of the left common iliac artery. Focal severe stenosis of the external iliac artery was also found, as well as complete occlusion of the right iliac artery. The bilateral lower extremity run off demonstrated that the left leg was completely supplied by small

collateral vessels and no arterial flow was present beyond his proximal calf.

On September 20, 2003, Mr. Jordan had an above the knee amputation at University Medical Center due to "atherosclerotic gangrene and the pathology report noted that the musculature of the lower extremity below the knee was dark and soupy and the trifurcation vessels were markedly calcific." The amputation was subsequently revised and more leg removed because of "severe atherosclerosis of major arteries."

In addition to testifying about the records and the conditions above described, Dr. Marc Mitchell, Defendant's expert, opined that because of the documented medical findings, that the amputation and complications of Mr. Jordan's left leg were the natural progression of his disease, and that the amputation was not preventable, irrespective of the level of care that Mr. Jordan received at the Defendant's facility. Dr. Mitchell's testimony was bolstered by the testimony of Christine Trahan, a wound care specialist, who had reviewed the records and concurred with Dr. Mitchell's opinion.

Dr. Truly's opinions are listed in his affidavit and report, which was filed in March and again in response to this motion. His argued that YCHRC committed numerous breaches of the acceptable standard of medical care, including, but not limited to, the following:

(A) No documentation of an attempt to take or monitor his pedal pulse;

(B) The anti-psychotic medications prescribed were inappropriate for Willie J. Jordan;

(C) The care plan following Willie J. Jordan's skin breakdown was not properly documented nor properly done, contributing to his downward spiraling health;

(D) The medications prescribed to Willie J. Jordan to increase blood flow to his lower extremities were improperly administered;

(E) With proper care Willie J. Jordan's above the knee amputation was preventable;

(F) That Mr. Jordan received inadequate nutrition and hydration while a resident at YCHRC and this was a contributing cause of the deterioration of his health;

(G) Mr. Jordan experienced weight loss as a result of malnutrition while a resident at YCHRC, which was greater than the weight loss from his amputation;

(H) Improper nutrition and hydration prevented him from healing from his pressure wounds, skin breakdowns, and precipitated his eventual amputation;

(I) That Willis J. Jordan would not have suffered skin break down, dehydration or malnutrition if an appropriate plan of care had been implemented and followed on his admission on October 28, 2002.

Dr. Truly further opined that Mr. Jordan suffered from gross neglect and mistreatment that led to the development of the decubitus lesions (pressure sores) on his left foot and that properly treated, the lesions would have healed and the amputation been avoided. He further opined that Mr. Jordan was neglected and that the neglect caused the progression of his left foot sore to a gangrenous state necessitating the amputation. He further argued that post amputation, Mr. Jordan developed toxic coccyx and scrotum decubitus/pressure sores due to immobility and that these were not adequately treated, causing Mr. Jordan to develop a urinary tract infection and sepsis as a result of the poor debridement of his amputation and stump. Additionally, poor wound care by the Defendant causally contributed to his death. Dr. Truly further opined that Mr. Jordan was suffering from severe malnutrition and dehydration.

The Defendant has now moved *in limine* to exclude the expert witness testimony of Dr. Truly [Doc. # 166] and moved to strike, in its entirety, the testimony of Dr. Truly [Doc. # 192].

## APPLICABLE LAW

Fed. R. Civ. P. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient factual data, (2) the testimony is the product of reliable principals and methods, and (3) the witness has applied the principals and methods reliably to the facts of the case.

The Supreme Court has stated that Rule 702 should be employed by trial judges to "insure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrill-Dow Pharmaceuticals*, 509 U.S. 579, 593 (1993). *Daubert* further sets forth a non-exhaustive "flexible" list of factors that district courts may use in analyzing the reliability of an expert's proffered testimony, including "whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Daubert*, 509 U.S. at 593-594; *Kumho Tire Company v. Carmichael*, 526 U.S. 137, 147-49 (1999).

The Defendant moves to exclude the expert testimony of Dr. Truly based on the fact that his anticipated opinions do not pass muster under *Daubert.* This Court, during the *Daubert* hearing, found that Dr. Truly is qualified by education, training and experience to render medical opinions under Rule 702. The issue currently before the Court is whether or not the anticipated

opinions are based on sufficient facts or data, that the testimony is the product of reliable principals and methods, and that Dr. Truly has properly applied the principals and methods relied to the relevant facts.

## ANALYSIS

This Court has been asked to make a call as to whether the Plaintiff's expert should be restricted in his testimony, or in the alternative, should be prevented from testifying at all. It is well known to all concerned the Rule on relevant evidence. *See* Fed. R. Evid. 401, 402.  Citizens have a right to their day in Court, and they are allowed that privilege through the adversary system.  In this case, the Plaintiff was less than specific in most of the opinions to be offered by Dr. Truly.  In response, the Defendant chose not to depose Dr. Truly, and set the *Daubert* motion after the time had run to supplement Dr. Truly's opinion testimony.  The Court has examined the opinions and objections and declines to go through all of the testimony at the *Daubert* hearing, along with the accompanying briefs and motions, line by line, to make rulings as to which statements are admissible and which are not. The Court has previously found that Dr. Truly is qualified under Rule 702 and that under the Rules he will be restricted to testifying to the opinions expressed in his Rule 26 disclosures.  This Court will be much more effective in its analysis when the testimony is given in the context of a trial, and hence the Court declines to totally strike the testimony of Dr. Truly and deny the Plaintiff the right to present him as their expert.

However, there are handful of matters that are clearly outside the bounds of Dr. Truly's disclosed opinions, and the Court will preliminarily exclude this testimony.  The Defendant has

moved to strike a number of distinct opinions offered by Dr. Truly in his testimony on the original *Daubert* motion. *See* Def.'s Mot. at 2-3 [Doc. # 192] (May 21, 2008). The Court will briefly address these and other remaining issues below.

First, the Court will exclude Dr. Truly's testimony regarding peripheral artery disease mismanagement. Nowhere in his report does he mention peripheral artery disease, although he does make vague allegations of neglect and mismanagement. The Court finds that they are not specific enough regarding peripheral artery disease mismanagement to be admitted. **Anything related to peripheral artery disease mismanagement shall be excluded.**

Second, Dr. Truly mentions medications prescribed to increase blood flow, arguing that it was the nursing home's duty to prescribe Pletal to Mr. Jordan. In addition to confusing the standard of care owed by the nursing home, it is the understanding of this Court that the medication Pletal is of no consequence in increasing blood flow and is used merely to manage symptoms. **The issue of Pletal is irrelevant and will not be mentioned by Dr. Truly.**

Third, Dr. Truly testified that the Defendant should have referred Mr. Jordan to a wound care center after he developed the sore on his left heel, and that Mr. Jordan should have been enrolled in a cessation of smoking program upon his admission to YCHRC. Dr. Truly testified that either of these acts by the Defendant would have prevented the amputation of Mr. Jordan's leg. The Court finds that the testimony on both of these issues is outside the scope of Dr. Truly's expert report, and that **testimony regarding these issues will be excluded.**

Fourth, Dr. Truly testified that the Defendant allowed Mr. Jordan to "lay there for six weeks without proper medical attention." The Court finds that this opinion is generally and sufficiently covered in the disclosures and **testimony to this will be allowed.**

Fifth and finally, Dr. Truly's opinions on revascularization are outside the scope of his disclosed opinions.  Moreover, this issue is not something that the nursing home should be required to consider–it is a call for the treating physician.  **Dr. Truly's opinion that the nursing home had a duty to refer Mr. Jordan to a vascular surgeon for revascularization is excluded**.

In briefing the Motion to Strike, the parties raised the issue of what duty of care the Defendant owed to Mr. Jordan. The Plaintiff will have to establish the necessary standard of care and the Defendant will only be held thereto.  Defendant is an institution for the aged or infirm and is not a hospital.  Likewise, the standard of care for the nurses must be established by the Plaintiff, and the Defendant's employees will not be held to any higher standard of care than that mandated by law.

It is not the duty of this Court to judge the credibility of the witnesses.  The opinions advocated by the experts for the Plaintiff differ widely from the opinions to be offered by the experts for the Defendant.  There are significant fact issues left to be developed and, except as above stated, this Court finds that the Motions to Strike and to Exclude the Testimony of Dr. Truly, should be **overruled**.

IT IS, THEREFORE, ORDERED that the Defendants' Motion to Exclude the Testimony of Dr. William Truly [Doc. # 166] and the Motion to Strike [Doc. # 192] are **overruled.**

SO ORDERED on this, the 11th day of June, 2008.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE